UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
LAREDO DIVISION

| | | |
|---|---|---|
| MARIO ALBERTO ANDRADE, SR.; and IRENE HERRERA, | § § § | |
| Plaintiffs, | § § | |
| v. | § § | CIVIL ACTION NO. |
| WEBB COUNTY, TEXAS; ORLANDO VILLANUEVA; ARTURO GARZA-GONGORA; HORTENCIA AVALOS; MARIA VAILLANCOURT; and JULIO ARRIAGA, | § § § § § § § | _____ |
| Defendants. | § | |

## PLAINTIFFS' ORIGINAL COMPLAINT

> This is a tragic unnecessary case of death resulting from sepsis in Webb County's jail. The Defendants were deliberately indifferent to 30-year-old Mario Alberto Andrade, Jr.'s life-threatening medical needs. Mario was left alone in a cell to die.



TO THE HONORABLE JUDGE OF SAID COURT:

The Plaintiffs file this complaint and for cause of action will show the following.

## Parties

1.      Plaintiff Mario Alberto Andrade, Sr. is a natural person who resides and did reside in Texas at all relevant times. Mario Alberto Andrade, Sr. was Mario Alberto Andrade, Jr.'s legal and biological father. Mario Alberto Andrade, Jr. is referred to herein at times as "Mr. Andrade" and/or "Mario."

2.      Plaintiff Irene Herrera ("Ms. Herrera") is a natural person who resides and did reside in Texas at all relevant times. Ms. Herrera was Mario Alberto Andrade, Jr.'s legal and biological mother.

3.      Defendant Webb County, Texas ("Webb County") is a Texas county. Webb County may be served with process pursuant to Federal Rule of Civil Procedure 4(j)(2) by serving its chief executive officer, County Judge Tano E. Tijerina, at 1000 Houston Street, Third Floor, Laredo, Texas 78040, or wherever Honorable Judge Tijerina may be found. Service on such person is also consistent with the manner prescribed by Texas law for serving a summons or like process on a county as a Defendant, as set forth in Texas Civil Practice and Remedies Code Section 17.024(a). Webb County acted or failed to act at all relevant times through its policymakers, employees, agents, representatives, and/or police officers and is liable for such actions and/or failure to act to the extent allowed by law (including but not necessarily limited to law applicable to claims pursuant to 42 U.S.C. § 1983).

4.      Defendant Orlando Villanueva ("Mr. Villanueva") is a natural person who resides and may be served with process at 5506 Conroe Street, Laredo, Texas 78046. Mr. Villanueva may also be served with process at his place of employment, Laredo County Detention Center, 4702

East Saunders, Laredo, Texas 78401. Mr. Villanueva may also be served with process at his alternate place of employment, MedPoint Ambulance, 6318 Krone Lane, Laredo, Texas 78041. Finally, Mr. Villanueva may be served with process wherever he may be found or, pursuant to Federal Rule of Civil Procedure 4(e), by leaving a copy of this complaint and a summons directed to Mr. Villanueva at Mr. Villanueva's dwelling or usual place of abode with someone of suitable age and discretion who resides there. Mr. Villanueva is being sued in his individual capacity and acted at all relevant times under color of state law. Mr. Villanueva was employed by and/or was the agent and/or designee and/or contractor of and for Webb County at all such times and acted or failed to act in the course and scope of his duties for Webb County.

5. Defendant doctor Arturo Garza-Gongora ("Dr. Garza-Gongora") is a natural person who resides in Texas and who may be served with process at 7210 McPherson Road, #120, Laredo, Texas 78041. Dr. Garza-Gongora may also be served with process at Webb County Jail, 1001 Washington Street, Laredo, Texas 78042. Dr. Garza-Gongora may also be served with process wherever he may be found or, pursuant to Federal Rule of Civil Procedure 4(e), by leaving a copy of this complaint and a summons directed to Dr. Garza-Gongora at Dr. Garza-Gongora's dwelling or usual place of abode with someone of suitable age and discretion who resides there. Dr. Garza-Gongora is being sued in his individual capacity and acted at all relevant times under color of state law. Dr. Garza-Gongora was employed by and/or was the agent and/or designee and/or contractor of and for Webb County at all such times and acted or failed to act in the course and scope of his duties for Webb County.

6. Defendant Hortencia Avalos ("Ms. Avalos") is a natural person who resides and may be served with process at 1905 E. Lyon Street, or in the alternative 1905 Lyon Street, Laredo, Texas 78043. Ms. Avalos may also also be served with process at her place of employment, Webb

County Jail, 1001 Washington, Laredo, Texas 78042. Ms. Avalos may also be served with process wherever she may be found or, pursuant to Federal Rule of Civil Procedure 4(e), by leaving a copy of this complaint and a summons directed to Ms. Avalos at Ms. Avalos' dwelling or usual place of abode with someone of suitable age and discretion who resides there. Ms. Avalos is being sued in her individual capacity and acted at all relevant times under color of state law. Ms. Avalos was employed by and/or was the agent and/or designee and/or contractor of and for Webb County at all such times and acted or failed to act in the course and scope of her duties for Webb County.

7.      Defendant Maria Vaillancourt ("Ms. Vaillancourt" or "Officer Vaillancourt") is a natural person who resides and may be served with process at 411 Center Road, Laredo, Texas 78045. Ms. Vaillancourt may also be served with process at her place of employment, Webb County Jail, 1001 Washington Street, Laredo, Texas 78042. Ms. Vaillancourt may also be served with process wherever she may be found or, pursuant to Federal Rule of Civil Procedure 4(e), by leaving a copy of this complaint and a summons directed to Ms. Vaillancourt at Ms. Vaillancourt's dwelling or usual place of abode with someone of suitable age and discretion who resides there. Ms. Vaillancourt is being sued in her individual capacity and acted at all relevant times under color of state law. Ms. Vaillancourt was employed by and/or was the agent and/or designee and/or contractor of and for Webb County at all such times and acted or failed to act in the course and scope of her duties for Webb County.

8.      Defendant Julio Arriaga ("Mr. Arriaga" or "Deputy Arriaga") is a natural person who resides and may be served with process at 4116 Capitol Lane, Laredo, Texas 78046. Mr. Arriaga may also be served with process at his place of employment, Webb County Jail, 1001 Washington Street, Laredo, Texas 78042. Mr. Arriaga may also be served with process wherever he may be found or, pursuant to Federal Rule of Civil Procedure 4(e), by leaving a copy of this

complaint and a summons directed to Mr. Arriaga at Mr. Arriaga's dwelling or usual place of abode with someone of suitable age and discretion who resides there. Mr. Arriaga is being sued in his individual capacity and acted at all relevant times under color of state law. Mr. Arriaga was employed by and/or was the agent and/or designee and/or contractor of and for Webb County at all such times and acted or failed to act in the course and scope of his duties for Webb County.

### Jurisdiction

9.      The court has original subject matter jurisdiction over this lawsuit according to 28 U.S.C. § 1331 and 1343(4), because this suit presents a federal question and seeks relief pursuant to federal statutes providing for the protection of civil rights. This suit arises under the United States Constitution and a federal statute including but not necessarily limited to 42 U.S.C. § 1983. The Plaintiffs do not, by including the following sentence, assert, stipulate to, or allege any state law claims. However, to the extent any such claims are alleged or construed to be alleged in this pleading, the court has supplemental jurisdiction over any such claims pursuant to 28 U.S.C. § 1367(a) because they are so related to the claims within the court's original jurisdiction that they and the claims within the court's original jurisdiction arise from a common nucleus of operative fact and form part of the same case or controversy under Article III of the United States Constitution.

10.     The court has personal jurisdiction over Webb County because it is a Texas county. The court has personal jurisdiction over the natural person Defendants because they reside in and are citizens of Texas.

### Venue

11.     Venue is proper in the Laredo Division of the United States District Court for the Southern District of Texas, pursuant to 28 U.S.C. § 1391(b)(2), because it is the division and

district in which a substantial part of the events or omissions giving rise to claims asserted in this pleading occurred.

Factual Allegations Statement

12.    The Plaintiffs provide in the Factual Allegations sections below the general substance of certain factual allegations.  The Plaintiffs do not intend that those sections provide in detail, or necessarily in chronological order, any or all allegations.  Rather, the Plaintiffs intend that those sections provide the Defendants sufficient fair notice of the general nature and substance of the Plaintiffs' allegations.  Whenever the Plaintiffs plead factual allegations "upon information and belief," the Plaintiffs are pleading that the specified factual contentions have evidentiary support or will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.

Factual Allegations: Mario



13.    Mario was born in 1985, in Forest Grove, Oregon, to Mario Alberto Andrade, Sr. and Irene Herrera.  Mario was a very healthy and happy baby.  Mario was a fast learner, and he began walking at the age of ten months.  He enjoyed being outside playing with family and friends.

14.     Mario played baseball and football.  He also played drums in the middle school band.  He enjoyed reading comic books and got along with everyone.  He liked riding his bike, skateboarding, and roller boarding at the park.  Mario even wrote a poem in the 5th grade which was published.

15.     Mario was a significant help to his mother, Irene.  Irene would sell Easter baskets in the neighborhood, and Mario would help.  When Irene worked as a restaurant server, Mario helped on his days off from school.  He would take orders from customers and deliver drinks and food to tables.  Mario's death was a great loss to his family.

<u>Factual Allegations: Mario's Incarceration and Death</u>

16.     Mario was arrested and ultimately jailed in the Webb County jail on November 20, 2015.  Dr. Garza-Gongora, according to a nurse's note, allegedly conducted an initial evaluation of Mario.  Dr. Garza-Gongora noted that Mario was "alert and oriented x3."  This means, according to standardized usage in the medical community, that Mario allegedly knew who he was, where he was, and had a general awareness of the date, time of day, and/or season.  However, upon information and belief, Mario did not have knowledge of what had occurred or why he was in jail.  If Mario had such knowledge, upon information and belief, the nurse's note would have read "alert and oriented x4."  Dr. Garza-Gongora, according to the nurse's note, indicated that Mario had slurred speech and appeared to be under the influence of drugs.  Further, according to the nurse's note, Mario denied drug use other than marijuana.  Mario also complained of right knee pain due to an alleged fall.  Dr. Garza-Gongora, according to the nurse's note, indicated that there was no swelling to the right knee and there was only minor bruising to the inner side of that right knee.  Dr. Garza-Gongora also indicated, according to the nurse's note, that Mario denied heroin use or cocaine use.

17.    Allegations in this paragraph are made upon information and belief. Mario was already showing obvious signs of sepsis when Dr. Garza-Gongora consulted with Mario. Those signs are mentioned in the "Factual Allegations: Sepsis" section of this pleading. Mario demonstrated an abrupt change in mental status, a body temperature either too high or too low, a heart rate not higher than ninety beats per minute, respiratory rate higher than twenty breaths per minute, difficulty breathing, and/or confusion or disorientation. Dr. Garza-Gongora did not closely examine Mario for needle marks, did not us a stethoscope to check Mario's breathing, did not use a stethoscope to check Mario's heart, did not take Mario's temperature, and did not take Mario's blood pressure. Dr. Garza-Gongora did not check Mario for skin infections. Dr. Garza-Gongora knew that Mario was an addicted IV drug user and had a significant risk of developing sepsis from any open wounds and/or injection sites. Dr. Garza-Gongora, despite such knowledge, chose not to conduct a complete physical examination of Mario. Dr. Garza-Gongora, due to the consultation being at approximately 5:10 p.m., and his consequent desire to leave the facility, chose to spend just a brief amount of time with Mario. Dr. Garza-Gongora's normal hours would have ended at 3:00 p.m. If Dr. Garza-Gongora would have chosen to conduct a full examination, based upon his knowledge of Mario's current obvious and visible mental and physical status, Mario's IV drug use and addiction, and Mario's increased propensity for development of sepsis, as well as the well-known effect of sepsis (death), Dr. Garza-Gongora would have ordered that Mario be admitted immediately to a hospital for sepsis treatment. He did not do so, and Mario died as a result. Dr. Garza-Gongora was deliberately indifferent to Mario's serious medical needs.

18.    Defendant Mr. Villanueva, who was not an LVN as indicated in Webb County records, but instead an EMT, also screened Mario on November 20, 2015. Mr. Villanueva noticed that Mario had slurred speech and believed that Mario was under the influence of drugs. He placed

Mario on a fifteen-minute observation for twenty-four hours so that he could be re-evaluated. However, Mr. Villanueva, had he chosen to conduct an examination of Mario, would have determined, upon information and belief, that Mario was already suffering from obvious and visible symptoms of sepsis (mentioned above). One of the symptoms of sepsis and/or septic shock is mental confusion, which could appear to be intoxication as a result of ingestion of drugs and/or alcohol. Thus, both Mr. Villanueva, and Dr. Garza-Gongora, were, upon information and belief, deliberately indifferent to Mario's medical needs by choosing not to determine whether Mario was suffering from sepsis instead of only intoxication.

19.     Mr. Villanueva made a conscious choice not to ask that Mario be admitted to a hospital but instead allowed him to stay in a cell, without any medical treatment whatsoever, until the following day. Mr. Villanueva wrote that he observed Mario in the booking area the following day allegedly "with no signs of distress." Upon information and belief, the allegation that Mario allegedly had "no signs of distress" is false. Instead, upon information and belief, it would have been clearly apparent that Mario was deathly ill and needed immediate and emergency medical treatment for sepsis. Mr. Villanueva, instead of immediately securing such treatment for Mario, put him on a thirty-minute observation and indicated that he should be transferred to the third floor and housed in cell 3-L (detox). This ensured the end result – Mario's death. According to Mr. Villanueva, a miscommunication between his "orders" and the shift occurred, and the thirty-minute change was not placed on the observation sheet. Instead, observations were allegedly made at fifteen-minute intervals after Mario was transferred to the third floor. As indicated elsewhere in this pleading, such "observations" served no purpose whatsoever with the specific facts related to Mario. Mario did not need "observations," he needed emergency and life-saving medical treatment at a Laredo hospital.

20.    Interestingly, when Ponce Trevino wrote to the Texas Commission on Jail Standards regarding Mario's death, he wrote that Mario was placed on observation due to slurred speech only based on an observation by a "nurse" during intake. Upon information and belief, Mr. Villanueva was not a nurse as represented.

21.    Allegations in this paragraph are made upon information and belief. Defendant Webb Clunty Jail Classification Officer Deputy Defendant Julio Arriaga was re-classifying inmates on November 21, 2015. The jail's AS400 computer system was down. Deputy Arriaga, before he takes any inmate to a higher floor in the jail, after the inmate is released from the booking area, physically checks each one. Deputy Arriaga was told by Mario, who was still in booking cell 109, that Mario had suffered a knee injury. Deputy Arriaga noticed on an observation sheet issued by the medical department that Mario had been under fifteen-minute observation due to allegedly being "under the influence (unknown substance)." Despite the fact that Mario was exhibiting symptoms of sepsis, which would have been obvious to Mr. Villanueva, Mr. Villanueva told Deputy Arriaga that Mario was okay to re-classify and move to an upstairs cell. This is further evidence of Mr. Villanueva's deliberate indifference to Mario's need for emergency medical treatment. Deputy Arriaga knew that Mario, if he was perceived as being under the influence of alcohol or some other substance, should have remained downstairs for detox and under strict observation. Deputy Arriaga also noticed a bruise on Mario's right knee, and Mario's right knee was swollen. These observations and knowledge would have indicated to Deputy Arriaga, who would have had knowledge of serious illnesses as a result of his duties as a classification officer, that Mario was suffering from infection and sepsis. Deputy Arriaga also observed that, while Mario was changing his uniform, he was unable to stand on his right knee. Mario was asked to sit down and dress.

22.     Allegations in this paragraph are made upon information and belief.  Deputy Arriaga went to medical and told Mr. Villanueva about his observation of Mario's knee, the injury, and the swelling.  Mr. Villanueva, showing deliberate indifference, and despite clear visible evidence that Mario was visibly symptomatic for sepsis, told Deputy Arriaga that Mario was okay to re-classify and move to a higher floor.  The decisions and choices of Mr. Villanueva and Deputy Arriaga to re-classify Mario, thus putting him into a cell to be left to die of sepsis, directly and proximately caused Mario's death.  Mario needed emergency medical treatment and needed to be admitted to a hospital.

23.     Allegations in this paragraph are made upon information and belief.  Deputy Arriaga went to the third floor of the jail and made contact with Defendant Officer Maria Vaillancourt.  Officer Vaillancourt was the officer in charge of the floor.  Upon information and belief, Officer Vaillancourt, as the floor officer, was required to continually observe inmates assigned to her floor.  Moreover, she was required to conduct visual checks of inmates at least once each hour.  She was also required to log, onto a floor log, information regarding any unusual observation of Mario.

24.     Deputy Arriaga handed to Officer Vaillancourt an observation sheet for Mario, that he was to be observed every fifteen minutes.  Mario was to be placed into cell block 3-L.  Officer Vaillancourt knew of Mario's supposed being under the influence of an unknown substance, and Mario was visibly ill at this point to the extent that even a layperson – a non-medical person – could see that he desperately needed emergency medical treatment.  Mario was seriously, deathly, visibly ill, as would be the case with someone with an advanced case of sepsis and/or being in septic shock.  Mario would ultimately die within approximately 55 hours after initially being observed and incarcerated in the Webb County jail.  However, he would die within approximately

16 hours after being observed by Officer Vaillancourt. In the alternative, if Officer Vaillancourt chose not to observe and examine Mario, or had him sufficiently observed and examined by someone on her floor, she chose to ignore his serious healthcare needs and was thus deliberately indifferent to those needs. Mario had an unusually high or low body temperature, and he had clammy or sweaty skin. He had an obvious altered mental status. He had difficulty breathing. Deputy Arriaga and Officer Vaillancourt were deliberately indifferent to Mario's visible serious illness and immediate need for life-saving medical treatment. Mario continued to exhibit obvious symptoms of sepsis, as referenced in the sepsis factual allegations section in this pleading. Even so, Mario was placed into a cell for supposed insufficient "observations" every fifteen minutes.

25.     Allegations in this paragraph are made upon information and belief. Mario continually complained of pain from his ribs down while he was in the cell, and he had a limp. In fact, when he was transported to his cell from the first floor (booking), he was transported in a wheelchair. The fact that Mario could not ambulate, or walk, on his own was obvious and apparent information known to the natural person Defendants and which indicated to them that Mario needed immediate medical care. Mario looked like someone who was very sick with the flu, but even more so. He constantly complained of pain and did not want to eat.

26.     Allegations in this paragraph are made upon information and belief. The Plaintiffs do not assert, allege, or stipulate that fifteen-minute checks of Mario were made. However, even if such checks were made, they were made in a manner that showed Officer Vaillancourt's deliberate indifference to Mario's serious life-threatening sepsis. Moreover, the checks were also made in a manner allowed and mandated by Webb County policy, procedure, and/or practice. That policy, procedure, and/or practice was wholly ineffective and showed deliberate indifference to inmates with known serious medical needs, such as Mario. That policy, procedure, and/or practice

allowed mere visual checks of inmates and did not mandate physical checks, with appropriate physical examination by medical personnel, of inmates with known serious medical needs such as Mario. It reminds one of a recent commercial for LifeLock. LifeLock is a credit monitoring company that also purports to resolve and/or avoid credit issues. In the commercial, an apparent dentist and assistant are shown examining a man in a dental chair. The following conversation ensues:

| | |
|---|---|
| Apparent dentist: | David, you have one of the worst cavities I have ever seen. Okay. Have a good day. |
| Patient: | Aren't you going to fix it? |
| Apparent dentist: | Oh, I'm not a dentist, I'm a dental monitor . . . tell you when you have a bad cavity. |
| Apparent dental assistant: | It's bad. Lunch? |
| Apparent dentist: | Oh, yes. |
| Patient: | Where are you going? |

https://www.youtube.com/watch?v=CGDzxPsdi7w

27.     The "patient" was shocked that the purported dentist and dental assistant knew that he had a bad cavity and would do nothing about it. The purported dentist and dental assistant merely noted that the supposed patient had a serious problem.

28.     The commercial is humorous and makes the point that LifeLock goes beyond simply monitoring credit. Unfortunately, with regard to "monitoring" Mario, there is no humor in its application. It did little good to "monitor" Mario, by making periodic visual checks, whether such checks were made on fifteen-minute or thirty-minute intervals. Mario did not need monitoring – he needed emergency medical treatment at a local Laredo hospital. If he would have received that medical treatment, he would have lived. Thus, the deliberate indifference of persons

mentioned herein to Mario's visible and known serious healthcare issues, in addition to and combined with Webb County's policy, practice, and/or procedure allowing "monitoring" by visual checks without the more important physical examination by appropriate medical personnel, was the moving force behind and resulted in and caused Mario's unnecessary death. Webb County required, according to its manual, only such visible monitoring, every thirty minutes, in areas where inmates were known to be "assaultive, potentially suicidal, mentally ill, or who had demonstrated bizarre behavior." There is no general requirement that seriously ill inmates be observed on a similar basis. Mario would have lived had the Defendants taken action regarding what was visible and apparent – Mario was suffering from sepsis and ultimately septic shock.

29.    Allegations in this paragraph are made upon information and belief. Webb County chose not to have a policy regarding known IV drug users as it relates to contracting infections, and screening and continuing monitoring for sepsis. Webb County knew that IV drug users were at a high risk for contracting infection as a result of use of needles and, consequently, deadly sepsis. This decision not to have such a policy was a moving force behind Mario's death. Webb County knew that, if it chose to ignore such inmates, and simply lock them into a cell, with only periodic visual observations, unnecessary death would occur.

30.    Allegations in this paragraph and the following paragraph are made upon information and belief. Officer Dale Fredericks was assigned to the third floor of the Webb County jail when Mario was locked into a cell on that floor. He was conducting a security check on the day Mario died. As he proceeded to check the 3-L cellblock, according to Webb County's custodial death investigation report, he observed through "the observation window" Mario lying face down on the floor. The visible depiction of this scene once again reminds one of the above-

referenced commercial. Unfortunately, while the commercial is amusing, this scene is quite different.

31.    Officer Fredericks, in accordance with the custom and policy of Webb County, was visibly viewing, through a window, a man who was at the time apparently deceased. Thus, the likely prior "viewings" through a "window" did and resulted in absolutely nothing to help Mario. In fact, the viewings served no purpose whatsoever as they related to Mario's "ticking time bomb" serious, deathly, septic condition. Mario's fate was determined through the string of decisions made by above-referenced Defendants and persons, once he was placed into the third floor cell to die of a curable illness. The fact that appropriate physical checks were not made is evidenced by the series of events occurring before physical entry to Mario's cell.

32.    Officer Fredericks, after first observing Mario face down on the floor, "Came around to checking the 3-L again and saw [Mario] in the same position." Officer Fredericks then grabbed his floor keys and hit the window. Once Mario did not respond, Officer Fredericks had to go to the front of the cell block and call out to Officer Arturo Santos and ask him to open the cell doors to check on an "unresponsive inmate." Thus, it is clear and apparent that Mario was receiving no physical attention or physical examination regarding his deathly illness.

33.    Allegations in this paragraph are made upon information and belief. Officer Hortencia Avalos was assigned to the third floor of the jail as the corrections officer in charge of the floor at the time of Mario's death. Officer Avalos knew that Mario was supposed to be "checked" every fifteen minutes. Officer Avalos also, being in charge of the floor, completed all of the observation sheets done during her shift. Webb County's criminal investigation custodial death report, from which this information regarding Officer Avalos was obtained, ended with, "The Medical Examiner's Autopsy Report read that this 30-year-old Hispanic male, Mario Alberto

Andrade, died from probable sepsis arising from a skin infection, most likely an infected injection site. He had been consuming cocaine prior to his death. The manner of death is accident." Mario's death was not an accident. Instead, it was a fully preventable death, if only Webb County's policies, practices, and procedures referenced in this pleading, and the actions of others referenced in this pleading, had resulted in Mario receiving life-saving medical treatment for sepsis at a Laredo hospital. Time was of the essence, and Webb County officers and medical personnel, all of whom were acting under color of state law at all relevant times, were deliberately indifferent to Mario's serious medical needs. Moreover, Mario had not consumed cocaine, or any other illegal drug, during the time of his incarceration at the Webb County jail.

34.    The custodial death report filed by the Webb County Sheriff's Office with the Texas State Attorney General indicates that Mario was initially in custody at the jail at 5:00 p.m. on November 20, 2015 and ultimately was pronounced deceased approximately two days, seven hours later between 12:09 a.m. and 12:19 a.m. on November 23, 2015. Ironically, Mario died at the place that he should have been taken in the beginning – Laredo Medical Center. The custodial death report also indicates that Mario was found in his cell at approximately 11:30 p.m. on Sunday, November 22, 2015. Thus, due to Mario being non-responsive at the time life-saving methods were finally used, he likely died some time earlier. The report also indicates that Mario, upon entry to the jail, was "intoxicated."

35.    Laredo Medical Center records indicate that the Laredo County jail originally called in Mario's condition as resulting from "a hanging." There seems to be little reason to falsely report the cause of Mario's death to the hospital other than to attempt to cover up the total disregard for Mario's health needs. The records also indicate that Mario had an "altered level of consciousness"

prior to his death. This is one of the most obvious and clear sepsis risk factors that Mr. Villanueva and Dr. Garza-Gongora should have known. Mario's abdomen was also distended.

36.     Two autopsies were conducted on Mario's body, and associated toxicology testing was done. The autopsies confirm the cause of Mario's death, which was also listed in the certificate of death, as being sepsis.

37.     Webb County Chief Medical Examiner Corinne E. Stern provided the written opinion that Mario "died from probable sepsis arising from a skin infection, most likely an infected injection site." The autopsy was performed at or about 1:00 p.m. on November 23, 2015. Dr. Stern wrote, "There was a visible edema of the right knee with erythema of the skin of the left thigh and posterior knee." In sepsis, tissue edema can develop. "Edema" is swelling caused by excess fluid trapped in a body's tissues. Erythema means reddening of the skin, usually occurring in patches. Dr. Stern also wrote, as above-referenced medical personnel could have easily seen at the jail (if they had chosen to look), "Needle injection sites were present on the right posterior thigh." The toxicology report was positive for cocaine or cocaine metabolite and cannabinoids or cannabinoids-related metabolites. Upon information and belief, Mario used no illegal drugs during incarceration at the jail.

38.     A second autopsy was performed at approximately 2:40 p.m. on November 27, 2015. Dr. Albert Chen performed the autopsy. Dr. Chen provided the opinion that Mario died as a result of probable sepsis from a skin infection, complicated by positive toxicology and other medical conditions. Thus, based on Dr. Chen's opinion, it was critically important that Mario be admitted to a hospital for sepsis treatment. Dr. Chen noted in his report that Mario's family was told that he died from possible aspiration of gastric fluids. This is curious, when combined with the fact that hospital records indicate that the hospital was initially told that Mario was found

hanging in his cell. It appears that Webb County and/or individuals in the jail mentioned in this pleading were attempting to cover up what had occurred.

39.     Dr. Chen noted in his autopsy report that Mario's upper extremities, or arms, were grossly symmetrical. However, Dr. Chen also noted that Mario's lower extremities, his legs, were grossly asymmetrical. They were obviously significantly different sizes. This would have been, and was, apparent to anyone who observed him during the time of his incarceration at the Webb County jail. Mario's right leg was much larger than his left leg, and it was swollen. His right mid-thigh circumference measured 54 centimeters, while his left mid-thigh circumference measured 45 centimeters. This nine centimeter difference equals approximately 3-1/2 inches. His right mid-calf circumference measured 34.5 centimeters, and his left mid-calf circumference measured 31.0 centimeters. There was clear visible evidence to people mentioned in this pleading of Mario's serious battle with sepsis.

40.     Dr. Chen also noted that Mario's right knee had four scattered crusted skin lesions. There were also a number of skin lesions and/or hematomas on Mario's left upper leg and/or his inguinal area. Dr. Chen also noticed various other crusted skin lesions. This was clear and unambiguous evidence to Mr. Villanueva and Dr. Garza-Gongora that Mario was an IV drug user and thus had a high risk for development of infection and sepsis. These clear indications were ignored, upon information and belief, by both Mr. Villanueva and Dr. Garza-Gongora.

41.     The Texas Commission on Jail Standards ("TCJS") investigated Mario's death. The TCJS determined that Webb County jail Commander Trevino's allegation that Mario was on thirty-minute observations was not true. Instead, the TCJS determined that the Webb County jail had indicated in writing that Mario was on fifteen-minute watches. Further, Mario was allegedly on "fifteen-minute suicide watches," according to the round sheet. Why and whether Mario was

on a "suicide watch" is a mystery.  Upon information and belief, Mario was not on such a "suicide watch."  Instead, the allegation that he was on a suicide watch, together with representations to the hospital after his death that he was found "hanging," constitute further evidence of the total incompetence, and more importantly deliberate indifference, of the Defendants.  The timing of periodic "monitoring" of Mario is particularly interesting when considered in light of other similar issues occurring at the Webb County jail.

42.     The TCJS noted (regarding an investigation of the death of inmate Federico Reyes) a potential concern regarding falsification of such round sheets.  An Assistant Director of the TCJS wrote to Webb County regarding those round sheets, related to Mr. Reyes, that officers responded to his cell at 19:54 hours although that time was not listed on the sheet.  Moreover, the last three entries on the sheet showed checks at 19:30, 19:45, and 20:00 (even though the last time of 20:00 was not listed in the death report).  This is clear evidence that round sheets, or observation logs, have been falsified at the Webb County jail.  The Assistant Director wrote seeking assurance that the times were not "pre-printed" and that officers are not "coming in after the fact and documenting the inmate activities."  She also wrote, "Bottom line, we want assurances that the officers are not pencil whipping the logs."

43.     Webb County knew for over two years prior to Mario's death that the jail had an issue with making false entries into inmate observation sheets.  In fact, on April 25, 2013, as a result of the death of Charles Gabriel Trevino Johnson, Webb County, Martin Cuellar, Esteban Paez, and Juan Enrique Villarreal were sued.  Allegations made in the next paragraph are made upon information and belief.

44.     Mr. Johnson died as a result of excessive force, being a pre-trial detainee.  However, Webb County and its jailers destroyed and fabricated material and crucial evidence for that case.

Specifically, Esteban Paez, and Juan Enrique Villarreal were indicted for making false entries and/or altering inmate observation sheets (a government record under the Texas Penal Code). Moreover, it was customary for Webb County officers who were allegedly checking inmates every fifteen minutes to, at the beginning of their respective shifts, fill in fifteen-minute time increments on the observation logs. They did so because they were deliberately indifferent to the serious medical needs of inmates, and because they were lazy. This constituted deliberate indifference. Thus, one may not assume that documents related to Mario's death and incarceration are accurate.

<u>Factual Allegations: Sepsis</u>

45.    The occurrence of sepsis in an inmate is a well-known and common risk to inmates with infections generally, and even more so for those inmates who engage in illegal IV drug use. Upon information and belief, the Defendants were aware of this risk generally and more specifically regarding Mario. Upon information and belief, the Defendants were also aware of the signs and symptoms of sepsis referenced in this "sepsis" section of this pleading.

46.    Sepsis is a global public health problem, resulting in more than three million hospitalizations per year. Over 5.3 million people die every year from sepsis. It is the tenth leading cause of death in the United States, and the number of deaths from sepsis each year is more than the total number of deaths caused by prostate cancer, breast cancer, and AIDS combined. More people are hospitalized in the United States for sepsis each year than are those who are hospitalized for acute myocardial infarction (a heart attack). Thus, medical professionals are more familiar with deadly sepsis than they are with heart attacks. The occurrence of sepsis is so well-known in the worldwide medical community that 90% of physicians believe that sepsis results in a significant financial burden on the healthcare system in their respective countries. However,

sepsis, properly treated, can be cured. In fact, nearly three-fourths of those receiving treatment survive.

47.     Sepsis is a life-threatening organ dysfunction syndrome caused by a person's bodily response to a particular infection. If sepsis is untreated, it can lead to septic shock and death. More generally, sepsis is a severe inflammatory response to infection. This has been known since the days of the Ancient Greeks. Upon information and belief, it was known to the Defendants at all times relevant to this lawsuit. Thus, significant inflammation connected with a potential infection would cause any healthcare provider who cares about the person to immediately seek emergency medical treatment in an appropriate facility.

48.     A delay in sepsis diagnosis, and ultimately treatment, is connected with a significantly increased likelihood of death. Thus, if any signs of sepsis are present, a healthcare provider, and/or jailer incarcerating someone involuntarily, must take swift action to obtain needed medical treatment.

49.     According to the Mayo Clinic, to be diagnosed with sepsis, a person must exhibit at least two of the following symptoms plus a probable or confirmed infection:

- body temperature above 101 degrees Fahrenheit or below 96.8 degrees Fahrenheit;
- heart rate higher than ninety beats per minute; and/or
- respiratory rate higher than twenty breaths per minute.

Severe sepsis would occur if, in addition to two of the above-referenced symptoms, a person has at least one of the following signs and symptoms:

- significantly decreased urine output;
- abrupt change in mental status;
- decrease in platelet count;
- difficulty breathing;
- abnormal heart pumping function; and/or
- abdominal pain.

Finally, a person would have septic shock when the person has the signs and symptoms of severe sepsis and in addition extremely low blood pressure that does not adequately respond to simple fluid replacement. It would have been a simple matter for the natural person Defendants referenced in this pleading to take Mario's temperature, to check his heart rate, to check his respiration rate, and to determine whether he was having abdominal pain. Upon information and belief, they chose not to do so despite knowledge of his illness and altered mental status.

50.     The Centers for Disease Control and Prevention ("CDC") lists four types of infections that are often linked with sepsis:

- lungs (pneumonia);
- kidney (urinary tract infection);
- skin; and/or
- gut.

The CDC also writes that an infection occurs when germs enter a person's body and multiply. When the infection is not resolved, it can cause sepsis. Moreover, the CDC writes that, to properly address sepsis, one must know the symptoms. Further, "ACT FAST. Get medical care IMMEDIATELY when an infection is not getting better or if it gets worse." The CDC indicates that there is no single symptom of sepsis, but that symptoms can include a combination of any of the following:

- confusion or disorientation;
- shortness of breath;
- high heart rate;
- fever, or shivering, or feeling very cold;
- extreme pain or discomfort;
- clammy or sweaty skin.

51.     The Sepsis Alliance notes that, according to a study published in 2014, 2.6 percent of people in the United States over the age of 13 years inject themselves with drugs. Further, people who do so are at risk for a number of illnesses, including Hepatitis and HIV. Nevertheless, writes

Sepsis Alliance, whether such people use drugs occasionally or are addicted to them, each time they inject a drug, they increase their risk of contracting infections and developing sepsis. This is well-known in the jail and corrections community, and, upon information and belief, specifically by all Defendants. They are also aware that several types of infection can be caused by injecting bacteria from used or dirty needles, or by failing to clean the skin before an injection (as would be common with illegal IV drug users.

52.    Moreover, the most common infection affecting people who inject drugs is cellulitis. Cellulitis is a type of infection that affects the skin and underlying tissue, and it causes redness and pain to advance up an affected limb. When people inject IV drugs, they are at risk of cellulitis from bacteria and even fungi. Ultimately, proper recognition and diagnosis of sepsis is a race against time and one which, if lost, results in death. The Defendants lost that race, and Mario died as a result.

53.    Laredo Physician Rafael Deliz, a pulmonologist and the medical director of Doctors Hospital Intensive Care Unit, spoke during an interview about sepsis. He provided information that any jailer, and medical personnel in a jail, including the Defendants and other medical personnel at the Webb County jail, would know. Dr. Deliz said:

> . . . [S]epsis is a . . . dysregulated responses. "Dysregulated" means its out of control and the body reacts with excessive response to an invasion of an infectious organism like a bacteria, a virus. It's a high cause of death in the United States, more than even cancer.
>
> *       *       *
>
> [Some of the signs of sepsis] that worry that cause that are a high respiration above 22 per minute. If you are breathing more than 22 times a minute, that's a sign of sepsis. If you have dizziness and you're sweating, and you feel very weak, that's another sign of sepsis because it may be that you have low blood pressure and that's another sign of sepsis, low blood pressure. The other sign is altered mental status. When you talk to somebody who has an infection, and he's talking incoherently, and he doesn't sound like the person he's 100% there, that's a dangerous sign of

sepsis. These three signs are the most important signs in the medical literature after review of one-million (1,000,000) medical records in ten years in major institutions in the United States.

\*       \*       \*

[Sepsis is] an extreme emergency. When you have sepsis, you have to receive an antibiotic within thirty minutes or less. Most of the time we don't have that time frame, but if you feel that you are very sick and you have pain in your body, you're coughing, and you're dizzy, and you're breathing very fast, blood pressure is low, you have to call the 9-1-1, and in the hospital, they have to take blood cultures. They have to culture your urine, your phlegm, and start antibiotics immediately because for hour you delay the treatment the mortality increases 10-5% per hour. If you wait too late at least the unfortunate case of some patients arriving at the hospital, the mortality increases significantly so the earlier you intervene, the higher the success.

\*       \*       \*

[M]y recommendation is don't delay the process. Unfortunately, there are cases I see in the Intensive Care Unit that they don't survive are the patients that delay the process. They feel sick, and their stubbornness or not going to be in a hospital caused them a serious, life-threatening illness. . . . It's a life-threatening condition, so don't delay the process. That's my message today, don't delay the process. If you don't feel okay, with fever, dizziness, you see your relative as talking incoherently, immediately you have to send the patient to the emergency room.

\*       \*       \*

At Doctors Hospital, we have a sepsis protocol, and we are perfection in this process for the last two years according to the Surviving Sepsis Guidelines according to the Society of Critical Care Medicine. We have very good numbers about sepsis. For example, in the patients that entered the hospital, we have a high percentage of blood cultures and immediate antibiotic use, higher than the others in the nation. In good compliance with the recommendations of the . . . organizations in this field, we have an intensive care unit with well-trained nurses and staff. We do rounds every day on sepsis patients – multidisciplinary with every specialty, nursing, respiratory therapy, nutritionists, pharmacy, the medical director. Everybody's a team work trying to make the patient healthier, making him to survive. We are ready for these types of complications.

Thus, Mario was in a great community (Laredo) in which he could have obtained life-saving

medical treatment. However, since he was incarcerated against his will, it was the Defendants'

duty to obtain reasonable medical care for him as a pretrial detainee.  They deliberately chose not to do so.

Factual Allegations (*Monell*): Jail Admissions Policy

54.     Prior to the filing of this lawsuit, in response to a Texas Public Information Act request, Webb County provided a copy of its jail operations manual purportedly in effect during the time Mario was incarcerated (the "Jail Operations Manual").  The operations manual has a section entitled "Admission of Inmates."  The general policy in that section reads:

> It shall be the policy of the Webb County Sheriff's Department to admit inmates into the jail as quickly and expeditiously as possible.  Sheriff's personnel shall comply with department requirements in regards to other agency representatives such as bondsmen and officers from other jurisdictions.  However, booking efficiency shall **not** conflict with proper security, prisoner security, prisoner identification and accuracy of documentation.

(Emphasis in original).

55.     Webb County's general policy was to admit inmates "as quickly and expeditiously as possible."  Moreover, that policy was not to conflict with "proper security, prisoner security, prisoner identification and accuracy of documentation." Thus, the general policy of Webb Country regarding quick and expeditious inmate admission demonstrated no concern whatsoever with inmate health and safety.  Instead, it focused solely on security, prisoner identification, and accurate documentation.  This policy, and its unabashed lack of concern for inmate physical and mental issues, was a moving force behind Mario's death.

56.     The 14th item listed in the "Booking Procedures" section of the "Admission of Inmates" section in the Jail Operations Manual is entitled "Physical Examination."  The "Physical Examination" policy is comprised of three sentences.  The second sentence reads, "Medical information which may be pertinent to the housing, classification, and work assignments of the inmates shall be forwarded to the classification." Thus, the physical examination policy makes no

allowance for a duty nurse, contemplated by the first sentence of the physical examination policy, to provide information to a physician, jailer in charge, or any other high-level jail administrator if the duty nurse, after physical examination, believes that an inmate should immediately be admitted to a hospital.  Instead, Webb County seems concerned only with what it will do with inmates once they are in the bowels of the jail.  This policy was a moving force behind Mario's death.

Factual Allegations (*Monell*): Medical and Illness Training, Education, and/or Licensure

57.    Orlando Villanueva was, upon information and belief, not a licensed vocational nurse as represented in the Webb County Sheriff's Office Criminal Investigation Division custodial death report sent by Webb County to the Texas Commission on Jail Standards.  Instead, upon information and belief, Mr. Villanueva was at the time a licensed EMS provider.  Webb County's policy and practice of allowing a person with EMS credentials, and not at least credentials as a registered nurse and/or physician, to classify and/or reclassify inmates based on physical examination related to potential serious healthcare issues, such as sepsis, showed the County's deliberate indifference to the medical needs of inmates generally and Mario specifically.  This policy was a moving force behind Mario dying in the custody of Webb County.

58.    The Jail Operations Manual contains a "Mental Disabilities/Suicide Prevention Plan."  That plan requires training and reporting.  However, upon information and belief, the Jail Operations Manual, despite the high risk of death from, and common development of, sepsis provides no policies and/or requirements regarding identification and/or treatment of sepsis.  Thus, Webb County made a deliberate decision not to address inmates with this deadly illness.  This failure to adopt such a policy, or to include such a policy in the Jail Operations Manual, was a moving force behind Mario's death.

59.    Moreover, Webb County decided to include in its Jail Operations Manual a policy regarding inmates who, upon intake, have signs and/or symptoms of a cold or flu.  The policy required such an inmate to wear a mask during the intake process and be isolated for 72 hours thereafter in a medical cell, or placed in a single one-man cell.  It also required that an inmate be given a nasal swab to be sent to lab to determine the type of any flu virus.  The policy contains other detailed requirements.  The decision of Webb County to include such an illness-specific policy, together with the corresponding decision not to include a policy regarding sepsis, showed Webb County's deliberate indifference to inmates with sepsis and was a moving force behind Mario's death.  Upon information and belief, Webb County did not have in place during Mario's incarceration any sepsis-specific policy.

### Factual Allegations (_Monell_): Jail Conditions and/or Management

60.    Webb County commissioners, far too late for Mario, approved a resolution to go on a November 2017 ballot for voters' approval of a new county jail.  Webb County Sheriff Martin Cuellar said that the existing jail was a "public safety issue."  Sheriff Cuellar said that the current jail is too small, too close to downtown and the border, too near the railroad tracks, and does not do enough to facilitate prisoners with mental health issues.  Clearly, a jail that was not doing enough to facilitate prisoners with mental health issues, by the Sheriff's own admission, would also not be able to do enough to facilitate prisoners with serious medical issues such as sepsis.

61.    Sheriff Cuellar also wrote, "Webb County is wasting millions of dollars to house prisoners in other counties because we do not have enough space to house them in our old jail.  Our old jail is 31 years old and is antiquated."  A Webb County jail Facebook page listed the following as "FACTS:" "Every day, the Webb County jail is over capacity.  Every day, Webb

County needs to send inmates to other counties. Every day, Webb County is wasting money due to an outdated, under capacity jail."

62.     Ultimately, Webb County decided to continue with its jail which constitutes a public safety issue and does not do enough to assist prisoners with mental health and/or serious medical issues. On Tuesday, November 7, 2017, over 72% of Webb County voters voted against funding a new jail facility and law enforcement complex. Thus, unfortunately, it appears that deaths in the jail will continue. The antiquated jail, and overcrowding in it, were moving forces behind Mario's death. Staff were too busy to perform all actions they should have been able to perform, and that busyness was caused by Webb County's policy, practice, and/or custom.

<u>Factual Allegations (*Monell*): Prior Notice to Webb County Through Inmate Deaths</u>

63.     Webb County knew at the time it incarcerated Mario that its policies, procedures, and customs regarding inmates with serious medical and/or mental health needs were inadequate, and Webb County deliberately chose not to change policies and procedures in a manner which would have avoided Mario's death. Webb County's decision not to do so was a moving force behind Mario's death.

64.     On November 5, 2015, only fifteen days prior to Mario beginning his short incarceration at the Webb County jail, Gary Spaulding was screened by medical staff upon being admitted to the jail. Notably, as with Mario, the screening occurred after 5:00 p.m. Mr. Spaulding indicated that he was an alcoholic, and he requested detox. He, allegedly, like Mario (according to Webb County documents), was placed under fifteen-minute "observation" for signs and symptoms of alcohol withdrawal. Mr. Spaulding passed away in a cell at the Webb County jail approximately 25-26 hours after initially being incarcerated. Upon information and belief, as with

Mario, the jail's fifteen-minute alleged "observations" of Mr. Spaulding were insufficient to treat what were clearly serious and life-threatening medical needs. Upon information and belief, Webb County was doing its "rubber stamp" monitoring, without taking any action to assist Mr. Spaulding. It reminds one of the LifeLock commercial mentioned above. This would have put Webb County on notice that it should immediately change its practices and procedures regarding mere "observations" of inmates with known serious medical needs and/or who were under the influence of alcohol or another mind-altering substance. Upon information and belief, Webb County took no action to change its policies and procedures after the death of Mr. Spaulding. Further, upon information and belief, this was a moving force behind Mario's death.

65.    Only five days before Mario arrived at the Laredo County jail – on Sunday, November 15, 2015 – an inmate hung himself (ultimately dying a few days later). According to a custodial death report, filed by the Webb County Sheriff's Office with the Texas State Attorney General, Louis Alberto Bravo-Garcia, just a few years older than Mario, being 34 years old at the time of his death, attempted suicide by hanging.

66.    Jail mental health notes created approximately one month before, which were apparently the last time notes were taken for Mr. Garcia, indicated that Webb County Sheriff's Office Mental Health Specialist Jose Louis Macias recommended that Mr. Garcia be cleared to re-classify (still being on fifteen-minute "observations"). Texas Rangers investigated the death and receiving conflicting information from Webb County jail employees about whether Mr. Garcia was on suicide watch.

67.    A Texas Ranger was told that Mr. Garcia was not on suicide watch due to not having a clipboard beside the window to his cell with an observation sheet attached to it. A Texas Ranger was also told that Mr. Garcia was on suicide watch at a prior time, but that he was not on

suicide watch at the time he attempted to kill himself. LVN Chavarri, a Webb County jail employee, told a Texas Ranger that he read Mr. Garcia's chart and believed that Mr. Garcia should have been on suicide watch. Further, providing additional conflicting information, Correctional Officer Esquinca told a Texas Ranger that Mr. Garcia was not on fifteen-minute observations to his knowledge. Corporal Flores stated that LVN Chavarri said that Mr. Garcia was not on observation, but then later said that Mr. Garcia was on observation.

68.    The Texas Rangers report paints a picture of a jail with a total lack of communication. Sergeant Ramos affirmed as much to the Texas Ranger, indicating he felt like there was a communication issue due to Mr. Garcia being removed from suicide watch but still being on observation watch. Mario was taken, involuntarily, into this dangerous situation. Webb County had a duty and obligation to protect him, provide reasonable medical care, and not to punish him as a pretrial detainee by forcing him to die in a cell, alone, and untreated.

69.    It appears that the Webb County jail uses fifteen-minute "observations" as a placebo and/or a defense if something serious happens to an inmate. However, as indicated above, a fifteen-minute "observation" policy, procedure, and/or practice of Webb County was insufficient to save Mario's life and in fact it, without attendant medical care, was the moving force behind his death. Upon information and belief, Webb County chose not to change any of its policies and/or procedures regarding assisting inmates with significant healthcare and/or mental health issues as a result of Mr. Garcia's death.

70.    Mr. Spaulding's and Mr. Garcia's deaths were not isolated incidents, but instead were preceded by incidents in the Webb County jail going back for years. On November 5, 2002, Webb County and Webb County Sheriff Juan Garza were sued as a result of the death of Juan Saldivar. Upon information and belief, the Sheriff and people in the Sheriff's department, thus

being employees at Webb County, had been provided with detailed information regarding the flow of illegal drugs into the Webb County jail through corrections officers and other employees. Upon information and belief, Mr. Saldivar was provided with drugs in the Webb County jail which resulted in and caused his death. Despite this knowledge, upon information and belief, Webb County failed to implement policies and procedures, provide sufficient training to employees, and provide a high enough level of medical personnel (and also appropriate staffing) to address the death of inmates related to drug use.

71.    On December 30, 2004, Webb County and Webb County Sheriff Juan Garza were sued as a result of the death of Jorge Alberto Meza. Upon information and belief, Mr. Meza was provided with illegal drugs, while being incarcerated in the Webb County jail, and which lead to and caused his death. Webb County should have implemented appropriate policies and procedures to observe inmates who, like Mario, appeared intoxicated and/or high as a result of substance use and/or abuse. Upon information and belief, as a result of Mr. Meza's death, policies sufficient to avoid Mario's death were not implemented. Upon information and belief, Webb County became well-aware of risks to drug-using inmates, including infection and sepsis, years before Mario was involuntarily incarcerated. Thus, at the time of Mario's incarceration, Webb County was fully aware of policies, procedures, and practices that it needed to have in place.

72.    On April 28, 2011, a little more than four years prior to Mario's incarceration at the Webb County jail, Webb County was sued as a result of the death of Rodolfo Moreno, Jr. Allegations in paragraphs regarding this incident are pled upon information and belief. On or about April 28, 2009, the day before Mr. Moreno died, his parents visited him at the Webb County jail. Mr. Moreno had called earlier that day to tell his parents that he will feeling ill. His parents noticed when visiting him that he was incoherent and looked very ill. Mr. Moreno looked dazed

and kept swaying back and forth. His eyes were also rolled back in his head. They were concerned for their son, because he could not even sit up straight when they were visiting with him. Mr. Moreno's mother called the guard on duty and explained that her son looked ill. She also asked that her son be checked out medically. The guard told Mr. Moreno's mother that he would be looked at by Webb County medical staff. Mr. Moreno's mother was assured that her son would be provided with care, and Mr. Moreno's parents left the jail.

73.     Mr. Moreno's mother called the jail nurse to be sure that her son was receiving treatment. She was told by a purported registered nurse in charge, Mr. Elizondo, that her son simply had tonsillitis. She was told not to call back because her son was fine. However, the following day, Mr. Moreno's mother received a call from a federal agent and was told that her son had died. This description of the facts leading to Mr. Moreno's death shows more than a high level of incompetence, but instead deliberate indifference to Mr. Moreno's serious medical needs.

74.     Webb County had allowed a policy, custom, and/or practice develop that allowed illegal drugs to be smuggled into the jail for sale, distribution, and/or use. Moreover, its practice was to fail to provide medical care to, and/or protect, as required by the United States Constitution, inmates when such drug use occurred. Despite this knowledge, upon information and belief, Webb County failed to implement policies and procedures, provide sufficient training to employees, and provide a high enough level of medical personnel (and appropriate staffing) to address the death of inmates related to drug use. Upon information and belief, even with the egregious facts related to the death of Mr. Moreno, Webb County did not implement any new policies, procedures, and/or practices but instead allowed its existing policies, procedures, and practices regarding seriously ill inmates to continue. This was a moving force behind Mario's death.

75.     Thus, Webb County had been aware for years of the risk of jail pre-trial detainees committing suicide.  Webb County was aware that, if screening and/or pre-arrest actions of a detainee indicated the detainee might harm himself or herself, Webb County should take action to avoid such an occurrence.  Webb County knew that it must provide reasonable medical care to such persons, which would include appropriate observation, and reasonable accommodations.

### Factual Allegations (*Monell*): Deaths After Mario

76.     Moreover, after Mario died, as further evidence of Webb County practices, policies, and customs, inmates continued to die.  On or about September 6, 2016, Pedro Cadena, Jr. passed away after having seizures resulting from, upon information and belief, drug and/or alcohol use and/or a serious medical condition which went untreated by Webb County jail staff.  Mr. Cadena was only 37 years old at the time, and he had been housed at the jail for only approximately one week.

77.     Moreover, on or about December 15, 2016, Federico Reyes committed suicide at the Webb County jail.  He had been incarcerated at the jail for approximately one month and had allegedly committed offenses which should have placed him on suicide watch.  All incidents of inmate suicides referenced in this pleading are evidence of unwritten policies, practices, and customs engaged in by Webb County and which were a moving force behind Mario's death, because they are evidence that "monitoring" simply does not work unless it is reasonably designed and calculated to effectively stop inmate deaths.

Additional Factual Allegations Regarding *Monell* Claims Against Webb County

78.    Upon information and belief, relevant Webb County practices, procedures, policies, and customs were the moving force behind Mario's death, and some such practices, policies, procedures, and customs are described elsewhere in this pleading.   The Plaintiffs recite in this section other such policies, practices, procedures, and customs.

79.    Allegations in this paragraph are made upon information and belief.  Webb County policies, practices, procedures, and customs regarding staffing were a moving force behind Mario's death.  Webb County's policy and/or practice at the time of Mario's death was to have a nursing supervisor on duty only during the first shift (and not during the second and third shifts). Thus, at the time of Mario's death, and for hours leading up to it, there would not have been a scheduled nursing supervisor on duty.   Moreover, at the time of Mario's death, Webb County's policy and/or practice was also not to have a classification supervisor on duty during the second and third shifts.   Webb County thought so little of inmate safety that it chose to have jail administrator and classification supervisors work only 8:00 a.m. to 5:00 p.m. Monday through Friday.

80.    It was critically important for jail administrators and classification supervisors to be on duty when decisions regarding Mario were made, and such decisions were implemented. Webb County assistant jail administrators were assigned critical tasks related to inmate safety and healthcare, including:

- management, training, and scheduling;
- enforcement of facility rules and regulations;
- inmate management;
- functions associated with inmate supervision; and/or
- facility operations including cell searches and inmate intake.

Webb County classification officers likewise had critical duties related to Mario's health, including:

- classification of inmates upon admittance to the jail;
- inmate observation in holding cells; and/or
- inmate observation in detoxification cells.

After completing a booking process, a Webb County classification officer was responsible for correctly classifying an inmate to ensure that the inmate was housed appropriately according to his or her classification. More specifically, a classification officer must ensure, based upon his or her knowledge, experience, and education, and observations of an inmate, that the inmate is appropriately classified and/or admitted to a hospital if necessary. The staffing policies were a moving force behind Mario's death.

81.    Moreover, upon information and belief, during the entire relevant time period described in this pleading, Webb County did not have in place any video and/or audio monitoring equipment which captured Mario's cell in a manner allowing him to be monitored and/or watched by any Webb County personnel. Webb County consciously chose not to provide such monitoring equipment, even though it knew that the failure to observe intoxicated and/or seriously ill inmates would be violative of their constitutional rights. Webb County's policy of not securing and/or installing such monitoring equipment was a moving force behind Mario's death. This is particularly troubling, in light of other deaths at that facility. Obviously, Webb County simply did not care. It chose not to purchase equipment which would be relatively inexpensive as compared to loss of life. Webb County's policy of not having such monitoring equipment shocks the conscience in light of Webb County's knowledge of prior inmate deaths and Mario being left alone in a cell, seriously suffering from sepsis and on the verge of death. Upon information and belief, Webb County made a policy decision not to have audio and video monitoring equipment and chose

to expend funds on other matters instead, and such decision was made either by the lead jail administrator, county commissioners, commissioner's court, and/or county judge as policymakers.

82.    The county commissioners, commissioner's court, and/or county judge, and Webb County, chose to have a policy or practice whereby intoxicated inmates and/or inmates with severe medical needs would not be continuously monitored, and they chose to implement that policy and/or practice by failing to buy what would have been relatively inexpensive audio and video monitoring equipment. This policy or practice led to and proximately caused, and was a moving force behind, Mario's death.

83.    Webb County could not take a "vacation," or a "break," whether during second and third shifts, or on a weekend when Mario was incarcerated, from its constitutional obligations to provide reasonable medical care to, to protect, and not to punish Mario. Over twenty-five years ago, in November 1991, the Texas Commission on Jail Standards published the Guide for Development of Suicide Prevention Plans. Even that long ago, when society and medical professionals as a whole knew much less than they have learned over the last few years, the Commission recommended continuous observation for high risk, acutely suicidal inmates who had attempted suicide. Applying this standard to seriously ill inmates such as Mario, Webb County could not "stick its head in the sand" regarding Mario's serious medical needs and allow him to die in his cell.

84.    Further, Circuit Judge Goldberg, writing a concurring opinion on behalf of the United States Court of Appeals for the Fifth Circuit 25 years ago (in 1992) unambiguously wrote that the right to continual monitoring of prisoners with suicidal tendencies was clearly established. In *Rhyne vs. Henderson County*, 973 F.2d 386 (5th Cir. 1992), the mother of a pre-trial detainee brought suit for the death of her child. Although the mother did not prevail, Judge Goldberg

warned and put on notice all policymakers within the jurisdiction of the United States Court of Appeals for the Fifth Circuit, regarding pre-trial detainees in need of mental health care (and specifically those with suicidal tendencies):

> Fortunately, the policymakers in charge can learn from their mistakes and take the necessary additional steps to insure the safety of pretrial detainees in need of mental health care. **Other municipalities should also take heed of the tragic consequences which are likely to ensue in the absence of adequate safety measures to deal with detainees displaying suicidal tendencies.**
>
> **What we learn from the experiences of Henderson County is that when jailers know a detainee is prone to committing suicide, a policy of observing such a detainee on a periodic, rather than on a continuous, basis, will not suffice**; that vesting discretion in untrained jail personnel to assess the need for, and administer, mental health care, will not be responsive to the medical needs of mentally ill detainees; and that delegating the task of providing mental health care to an agency that is incapable of dispensing it on the weekends will endanger the well-being of its emotionally disturbed detainees. We need not remind jailers and municipalities that the Constitution works day and night, weekends and holidays—it takes no coffee breaks, no winter recess, and no summer vacation.
>
> So the plaintiff in this case did not prove that Henderson County adopted its policy of handling suicidal detainees with deliberate indifference to their medical needs. But that does not insulate Henderson County, or any other municipality, from liability in future cases. **Jailers and municipalities beware! Suicide is a real threat in the custodial environment. Showing some concern for those in custody, by taking limited steps to protect them, will not pass muster unless the strides taken to deal with the risk are calculated to work: Employing only "meager measures that [jailers and municipalities] know or should know to be ineffectual" amounts to deliberate indifference. To sit idly by now and await another, or even the first, fatality, in the face of the Henderson County tragedy, would surely amount to *deliberate* indifference.**

*Id.* at 395-96 (emphasis added).

85.    Judge Goldberg directly addressed a suicide situation. However, the principles set forth – that all pretrial detainees have certain constitutional rights which exist 24 hours every day, 7 days every week, 365 days every year – applies to Mario's situation. It would apply to every situation in which a person confined against his or her will has serious medical needs which could lead to serious injury and/or death.

<u>Cause of Action Against All Natural Person Defendants Under 42 U.S.C. § 1983 for Violation of Mario Alberto Andrade, Jr.'s 14th Amendment Due Process Right to Reasonable Medical Care, as a Pretrial Detainee (Episodic Act or Omission)</u>

86.    In the alternative, without waiving any of the other causes of action pled herein, without waiving any procedural, contractual, statutory, or common-law right, and incorporating all other allegations herein (including all allegations in the "Factual Allegations" section above) to the extent they are not inconsistent with the cause of action pled here, the natural person Defendants are liable to the Plaintiffs, pursuant to 42 U.S.C. § 1983, for violating Mario's right to reasonable medical care guaranteed by the 14th Amendment to the United States Constitution. Pretrial detainees are entitled to a greater degree of medical care than convicted inmates, according to the Fifth Circuit Court of Appeals. The natural person Defendants acted and failed to act under color of state law at all times referenced in this pleading. The natural person Defendants wholly or substantially ignored Mario's drug addiction risks and his obvious serious medical needs, and they were deliberately indifferent to those medical needs. The natural person Defendants had subjective knowledge of the substantial risk of death and responded with deliberate indifference to that risk. The natural person Defendants were aware of the excessive risk and were aware of facts from which an inference could be drawn of death (and they in fact drew that inference). The natural person Defendants violated clearly established constitutional rights, and their conduct was objectively unreasonable in light of clearly established law at the time of the relevant incidents. Mario, as a pretrial detainee, had a clearly established right to receive reasonable medical care. This was well-established at the time of Mario's incarceration at the Webb County jail, both through plentiful 5th Circuit Court of Appeals and United States Supreme Court precedent. This right included the right to be not be ignored, and to have his obvious symptoms taken seriously.

87.    In the alternative, the natural person Defendants' conscious disregard, state of

mind, subjective belief, subjective awareness, or mental culpability is irrelevant to the determination of the constitutional violation set forth in this section of this pleading. The United States Supreme Court, in *Kingsley v. Hendrickson,* 135 S. Ct. 2466 (2015), determined the state of mind necessary, if any, for officers sued in a case alleging excessive force against a pretrial detainee in violation of the 14th Amendment's Due Process Clause. *Id* at 2470-71. Constitutional rights set forth in this section of the pleading, and the constitutional right affording a pretrial detainee protection against excessive force, both flow from the 14th Amendment's Due Process Clause. *Id.* Since such constitutional protections flow from the same clause, the analysis of what is necessary to prove such constitutional violations should be identical.

88.     In *Kingsley*, a pretrial detainee sued several jail officers alleging that they violated the 14th Amendment's Due Process Clause by using excessive force against him. *Id.* at 2470. The Court determined the following issue: "whether, to prove an excessive force claim, a pretrial detainee must show that the officers were *subjectively* aware that their use of force was unreasonable, or only that the officer's use of that force was *objectively* unreasonable." *Id* (emphasis in original). The United States Supreme Court concluded that only the objectively unreasonable standard was the correct standard to be used in such excessive force cases, and that the officer's subjective awareness was irrelevant. *Id.* The Court did so, acknowledging and resolving disagreement among the Circuits. *Id.* at 2471-72.

89.     The Court flatly wrote "the defendant's state of mind is not a matter that a plaintiff is required to prove." *Id.* at 2472. Instead, "courts must use an objective standard." *Id* at 2472-73. "[A] pretrial detainee must show only that the force purposefully or knowingly used against him was objectively unreasonable." *Id.* at 2473. Thus, the Court required no *mens rea*, no conscious violation, and no subjective belief or understanding of offending police officers for an

episodic claim. Instead, the United States Supreme Court instructed all federal courts to analyze officers' conduct on an objectively reasonable basis. There is no reason to treat pretrial detainees' rights to reasonable medical care differently.

90.     It appears that this standard is now the law of the land. Earlier this year, in *Alderson v. Concordia Parish Corr. Facility*, 848 F.3d 415 (5th Cir. 2017), the Fifth Circuit Court of Appeals considered appeal of a pretrial detainee case in which the pretrial detainee alleged failure-to-protect and failure to provide reasonable medical care claims pursuant to 42 U.S.C. § 1983. *Id* at 418. The court wrote, "Pretrial detainees are protected by the Due Process Clause of the Fourteenth Amendment." *Id.* at 419 (citation omitted). The Fifth Circuit determined, even though *Kingsley* had been decided by the United States Supreme Court, that a plaintiff in such a case still must show subjective deliberate indifference by a defendant in an episodic act or omission case. *Id.* at 419-20. A plaintiff must still show that actions of such an individual person acting under color of state law were "reckless." *Id.* at 420 (citation omitted). However, concurring Circuit Judge Graves dissented to a footnote in which the majority refused to reconsider the deliberate indifference, subjective standard, in the Fifth Circuit. *Id.* at 420 and 424-25.

91.     The majority opinion gave only three reasons for their determination that the law should not change in light of *Kingsley*. First, the panel was bound by the Fifth Circuit's "rule of orderliness." *Id.* at 420 n.4. Second, the Ninth Circuit was at that time the only circuit to have extended *Kingsley's* objective standard to failure-to-protect claims. *Id.* Third, the Fifth Circuit refused to reconsider the law of the Circuit in light of United State Supreme Court precedent because it would not have changed the results in *Alderson. Id.* Even so, the Fifth Circuit noted, over twenty years ago, that the analysis in pretrial detainee provision of medical care cases is the same as that for pretrial detainee failure-to-protect cases. *Hare v. City of Corinth*, 74 F.3d 633,

643 (5th Cir. 1996). Thus, the trail leads to only one place – an objectively unreasonableness standard, with no regard for the natural person Defendants' subjective belief or understanding, should apply in this case and all pretrial detainee cases arising under the Due Process Clause of the 14th Amendment. The Fifth Circuit, and the district court in this case, should reassess Fifth Circuit law in light of *Kingsley* and simply apply an objective unreasonableness standard to claims in this case. There should be no subjective state of mind and/or conscious indifference standard necessary to be applied to the natural person Defendants. The Supreme Court discarded the idea that such a burden should be placed upon a plaintiff.

92.    The natural person Defendants are not entitled to qualified immunity. The natural person Defendants' denial of reasonable medical care, total disregard for Mario's health and safety caused, proximately caused, and were producing causes of Mario's death and other damages suffered by Mario and his parents.

93.    The United States Court of Appeals for the Fifth Circuit has held that using a state's wrongful death and survival statutes creates an effective remedy for civil rights claims pursuant to 42 U.S.C. § 1983. Therefore, the Plaintiffs, individually, seek all remedies and damages available to them for the 42 U.S.C. § 1983 violations pursuant to the Texas Wrongful Death Act (Chapter 71 of the Texas Civil Practice and Remedies Code). They seek those damages due to the wrongful death of their biological and legal son – Mario. The damages suffered by the Plaintiffs were caused and/or proximately caused by the natural person Defendants. If Mario had lived, he would have been entitled to bring a 42 U.S.C. § 1983 action and obtain remedies and damages provided by Texas law. Therefore, the natural person Defendants' actions caused, were the proximate cause of, and/or were the producing cause of the following damages suffered by the Plaintiffs:

- loss of services that they would have received from her son, Mario;

- expenses for Mario's funeral;

- past mental anguish and emotional distress resulting from and caused by the death of their son, Mario;

- future mental anguish and emotional distress resulting from and caused by the death of their son, Mario;

- loss of companionship and society that they would have received from their son, Mario; and;

- exemplary/punitive damages.

Exemplary/punitive damages are appropriate in this case to deter and punish clear and unabashed violation of Mario's constitutional rights. The natural person Defendants' actions and inaction showed a reckless or callous disregard of, or indifference to, Mario's rights and safety. Moreover, the Plaintiffs seek reasonable and necessary attorneys' fees available pursuant to 42 U.S.C. §§ 1983 and 1988.

<u>Cause of Action Against All Natural Person Defendants Under 42 U.S.C. § 1983 for Violation of Mario Alberto Andrade, Jr.'s 14th Amendment Due Process Right to be Protected from Harm as a Pretrial Detainee (Failure-to-Protect Claim) (Episodic Act or Omission)</u>

94.    In the alternative, without waiving any of the other causes of action pled herein, without waiving any procedural, contractual, statutory, or common-law right, and incorporating all other allegations herein (including all allegations in the "Factual Allegations" section above) to the extent they are not inconsistent with the cause of action pled here, the natural person Defendants are liable to the Plaintiffs, pursuant to 42 U.S.C. § 1983, for violating Mario's right to protection guaranteed by the 14th Amendment to the United States Constitution. The natural person Defendants acted and failed to act under color of state law at all times referenced in this pleading. The natural person Defendants wholly or substantially ignored Mario's drug addiction risks and his obvious serious medical needs, and they were deliberately indifferent to those medical

needs. Mario was involuntarily incarcerated, and the natural person Defendants failed to protect him from the serious illness raging in his body. The natural person Defendants had subjective knowledge of the substantial risk of death and responded with deliberate indifference to that risk. The natural person Defendants were aware of the excessive risk and were aware of facts from which an inference could be drawn of death (and they in fact drew that inference). The natural person Defendants violated clearly established constitutional rights, and their conduct was objectively unreasonable in light of clearly established law at the time of the relevant incidents. Mario, as a pretrial detainee, had a clearly established right to protection. This was well-established at the time of Mario's incarceration at the Webb County jail through plentiful precedent. This right included the right to be not be ignored, and to have his obvious symptoms taken seriously.

95.     In the alternative, the natural person Defendants' conscious disregard, state of mind, subjective belief, subjective awareness, or mental culpability is irrelevant to the determination of the constitutional violation set forth in this section of this pleading. The United States Supreme Court, in *Kingsley v. Hendrickson,* 135 S. Ct. 2466 (2015), determined the state of mind necessary, if any, for officers sued in a case alleging excessive force against a pretrial detainee in violation of the 14th Amendment's Due Process Clause. *Id* at 2470-71. Constitutional rights set forth in this section of the pleading, and the constitutional right affording a pretrial detainee protection against excessive force, both flow from the 14th Amendment's Due Process Clause. *Id.* Since such constitutional protections flow from the same clause, the analysis of what is necessary to prove such constitutional violations should be identical.

96.     In *Kingsley*, a pretrial detainee sued several jail officers alleging that they violated the 14th Amendment's Due Process Clause by using excessive force against him. *Id.* at 2470. The

Court determined the following issue: "whether, to prove an excessive force claim, a pretrial detainee must show that the officers were *subjectively* aware that their use of force was unreasonable, or only that the officer's use of that force was *objectively* unreasonable." *Id* (emphasis in original). The United States Supreme Court concluded that only the objectively unreasonable standard was the correct standard to be used in such excessive force cases, and that the officer's subjective awareness was irrelevant. *Id.* The Court did so, acknowledging and resolving disagreement among the Circuits. *Id.* at 2471-72.

97.    The Court flatly wrote "the defendant's state of mind is not a matter that a plaintiff is required to prove." *Id.* at 2472. Instead, "courts must use an objective standard." *Id* at 2472-73. "[A] pretrial detainee must show only that the force purposefully or knowingly used against him was objectively unreasonable." *Id.* at 2473. Thus, the Court required no *mens rea*, no conscious violation, and no subjective belief or understanding of offending police officers for an episodic claim. Instead, the United States Supreme Court instructed all federal courts to analyze officers' conduct on an objectively reasonable basis. There is no reason to treat pretrial detainees' right to protection differently.

98.    It appears that this standard is now the law of the land. Earlier this year, in *Alderson v. Concordia Parish Corr. Facility*, 848 F.3d 415 (5th Cir. 2017), the Fifth Circuit Court of Appeals considered appeal of a pretrial detainee case in which the pretrial detainee alleged failure-to-protect and failure to provide reasonable medical care claims pursuant to 42 U.S.C. § 1983. *Id* at 418. The court wrote, "Pretrial detainees are protected by the Due Process Clause of the Fourteenth Amendment." *Id.* at 419 (citation omitted). The Fifth Circuit determined, even though *Kingsley* had been decided by the United States Supreme Court, that a plaintiff in such a case still must show subjective deliberate indifference by a defendant in an episodic act or omission case. *Id.* at

419-20. A plaintiff must still show that actions of such an individual person acting under color of state law were "reckless." *Id.* at 420 (citation omitted). However, concurring Circuit Judge Graves dissented to a footnote in which the majority refused to reconsider the deliberate indifference, subjective standard, in the Fifth Circuit. *Id.* at 420 and 424-25.

99.    The majority opinion gave only three reasons for their determination that the law should not change in light of *Kingsley*. First, the panel was bound by the Fifth Circuit's "rule of orderliness." *Id.* at 420 n.4. Second, the Ninth Circuit was at that time the only circuit to have extended *Kingsley's* objective standard to failure-to-protect claims. *Id.* Third, the Fifth Circuit refused to reconsider the law of the Circuit in light of United State Supreme Court precedent because it would not have changed the results in *Alderson*. *Id.* Even so, the Fifth Circuit noted, over twenty years ago, that the analysis in pretrial detainee provision of medical care cases is the same as that for pretrial detainee failure-to-protect cases. *Hare v. City of Corinth*, 74 F.3d 633, 643 (5th Cir. 1996). Thus, the trail leads to only one place – an objectively unreasonableness standard, with no regard for the natural person Defendants' subjective belief or understanding, should apply in this case and all pretrial detainee cases arising under the Due Process Clause of the 14th Amendment. The Fifth Circuit, and the district court in this case, should reassess Fifth Circuit law in light of *Kingsley* and simply apply an objective unreasonableness standard to claims in this case. There should be no subjective state of mind and/or conscious indifference standard necessary to be applied to the natural person Defendants. The Supreme Court discarded the idea that such a burden should be placed upon a plaintiff.

100.    The natural person Defendants are not entitled to qualified immunity. The natural person Defendants' denial of reasonable medical care, total disregard for Mario's health and safety, and failure to protect him caused, proximately caused, and were producing causes of Mario's death

and other damages suffered by Mario and his parents.

101.    The United States Court of Appeals for the Fifth Circuit has held that using a state's wrongful death and survival statutes creates an effective remedy for civil rights claims pursuant to 42 U.S.C. § 1983.  Therefore, the Plaintiffs, individually, seek all remedies and damages available to them for the 42 U.S.C. § 1983 violations pursuant to the Texas Wrongful Death Act (Chapter 71 of the Texas Civil Practice and Remedies Code).  They seek those damages due to the wrongful death of their biological and legal son – Mario.  The damages suffered by the Plaintiffs were caused and/or proximately caused by the natural person Defendants.  If Mario had lived, he would have been entitled to bring a 42 U.S.C. § 1983 action and obtain remedies and damages provided by Texas law.  Therefore, the natural person Defendants' actions caused, were the proximate cause of, and/or were the producing cause of the following damages suffered by the Plaintiffs:

- loss of services that they would have received from her son, Mario;

- expenses for Mario's funeral;

- past mental anguish and emotional distress resulting from and caused by the death of their son, Mario;

- future mental anguish and emotional distress resulting from and caused by the death of their son, Mario;

- loss of companionship and society that they would have received from their son, Mario; and;

- exemplary/punitive damages.

Exemplary/punitive damages are appropriate in this case to deter and punish clear and unabashed violation of Mario's constitutional rights.  The natural person Defendants' actions and inaction showed a reckless or callous disregard of, or indifference to, Mario's rights and safety.  Moreover, the Plaintiffs seek reasonable and necessary attorneys' fees available pursuant to 42 U.S.C. §§

1983 and 1988.

<u>Cause of Action Against All Natural Person Defendants Under 42 U.S.C. § 1983 for Violation of Mario Alberto Andrade, Jr.'s 14th Amendment Due Process Right not to be Punished as a Pretrial Detainee (Episodic Act of Omission)</u>

102.    In the alternative, without waiving any of the other causes of action pled herein, without waiving any procedural, contractual, statutory, or common-law right, and incorporating all other allegations herein (including all allegations in the "Factual Allegations" section above) to the extent they are not inconsistent with the cause of action pled here, the natural person Defendants are liable to the Plaintiffs, pursuant to 42 U.S.C. § 1983, for violating Mario's right not to be punished guaranteed by the 14th Amendment to the United States Constitution. Pre-trial detainees are entitled not to be punished at all. The natural person Defendants acted and failed to act under color of state law at all times referenced in this pleading. The natural person Defendants wholly or substantially ignored Mario's drug addiction risks and his obvious serious medical needs, and they were deliberately indifferent to those medical needs. This, and other factual allegations in this pleading, constituted impermissibly punishing Mario as a pretrial detainee. The natural person Defendants had subjective knowledge of the substantial risk of death and responded with deliberate indifference to that risk. The natural person Defendants were aware of the excessive risk and were aware of facts from which an inference could be drawn of death (and they in fact drew that inference). The natural person Defendants violated clearly established constitutional rights, and their conduct was objectively unreasonable in light of clearly established law at the time of the relevant incidents. Mario, as a pretrial detainee, had a clearly established right not to be punished. This was well-established at the time of Mario's incarceration at the Webb County jail through plentiful precedent. This right included the right to be not be ignored, and to have his obvious symptoms taken seriously.

103.    In the alternative, the natural person Defendants' conscious disregard, state of mind, subjective belief, subjective awareness, or mental culpability is irrelevant to the determination of the constitutional violation set forth in this section of this pleading.  The United States Supreme Court, in *Kingsley v. Hendrickson,* 135 S. Ct. 2466 (2015), determined the state of mind necessary, if any, for officers sued in a case alleging excessive force against a pretrial detainee in violation of the 14th Amendment's Due Process Clause.  *Id* at 2470-71.  Constitutional rights set forth in this section of the pleading, and the constitutional right affording a pretrial detainee protection against excessive force, both flow from the 14th Amendment's Due Process Clause.  *Id.*  Since such constitutional protections flow from the same clause, the analysis of what is necessary to prove such constitutional violations should be identical.

104.    In *Kingsley*, a pretrial detainee sued several jail officers alleging that they violated the 14th Amendment's Due Process Clause by using excessive force against him.  *Id.* at 2470.  The Court determined the following issue: "whether, to prove an excessive force claim, a pretrial detainee must show that the officers were *subjectively* aware that their use of force was unreasonable, or only that the officer's use of that force was *objectively* unreasonable."  *Id* (emphasis in original).  The United States Supreme Court concluded that only the objectively unreasonable standard was the correct standard to be used in such excessive force cases, and that the officer's subjective awareness was irrelevant.  *Id.*  The Court did so, acknowledging and resolving disagreement among the Circuits.  *Id.* at 2471-72.

105.    The Court flatly wrote "the defendant's state of mind is not a matter that a plaintiff is required to prove."  *Id.* at 2472.  Instead, "courts must use an objective standard."  *Id* at 2472-73.  "[A] pretrial detainee must show only that the force purposefully or knowingly used against him was objectively unreasonable."  *Id.* at 2473.  Thus, the Court required no *mens rea*, no

conscious violation, and no subjective belief or understanding of offending police officers for an episodic claim. Instead, the United States Supreme Court instructed all federal courts to analyze officers' conduct on an objectively reasonable basis. There is no reason to treat differently pretrial detainees' right not to be punished.

106.    It appears that this standard is now the law of the land. Earlier this year, in *Alderson v. Concordia Parish Corr. Facility*, 848 F.3d 415 (5th Cir. 2017), the Fifth Circuit Court of Appeals considered appeal of a pretrial detainee case in which the pretrial detainee alleged failure-to-protect and failure to provide reasonable medical care claims pursuant to 42 U.S.C. § 1983. *Id* at 418. The court wrote, "Pretrial detainees are protected by the Due Process Clause of the Fourteenth Amendment." *Id.* at 419 (citation omitted). The Fifth Circuit determined, even though *Kingsley* had been decided by the United States Supreme Court, that a plaintiff in such a case still must show subjective deliberate indifference by a defendant in an episodic act or omission case. *Id.* at 419-20. A plaintiff must still show that actions of such an individual person acting under color of state law were "reckless." *Id.* at 420 (citation omitted). However, concurring Circuit Judge Graves dissented to a footnote in which the majority refused to reconsider the deliberate indifference, subjective standard, in the Fifth Circuit. *Id.* at 420 and 424-25.

107.    The majority opinion gave only three reasons for their determination that the law should not change in light of *Kingsley*. First, the panel was bound by the Fifth Circuit's "rule of orderliness." *Id.* at 420 n.4. Second, the Ninth Circuit was at that time the only circuit to have extended *Kingsley's* objective standard to failure-to-protect claims. *Id.* Third, the Fifth Circuit refused to reconsider the law of the Circuit in light of United State Supreme Court precedent because it would not have changed the results in *Alderson*. *Id.* Even so, the Fifth Circuit noted, over twenty years ago, that the analysis in pretrial detainee provision of medical care cases is the

same as that for pretrial detainee failure-to-protect cases. *Hare v. City of Corinth*, 74 F.3d 633, 643 (5th Cir. 1996). Thus, the trail leads to only one place – an objectively unreasonableness standard, with no regard for the natural person Defendants' subjective belief or understanding, should apply in this case and all pretrial detainee cases arising under the Due Process Clause of the 14th Amendment. The Fifth Circuit, and the district court in this case, should reassess Fifth Circuit law in light of *Kingsley* and simply apply an objective unreasonableness standard to claims in this case. There should be no subjective state of mind and/or conscious indifference standard necessary to be applied to the natural person Defendants. The Supreme Court discarded the idea that such a burden should be placed upon a plaintiff.

108.    The natural person Defendants are not entitled to qualified immunity. The natural person Defendants' denial of reasonable medical care, and total disregard for Mario's health and safety, constituted impermissible and unconstitutional punishment which caused, proximately caused, and were producing causes of Mario's death and other damages suffered by Mario and his parents.

109.    The United States Court of Appeals for the Fifth Circuit has held that using a state's wrongful death and survival statutes creates an effective remedy for civil rights claims pursuant to 42 U.S.C. § 1983. Therefore, the Plaintiffs, individually, seek all remedies and damages available to them for the 42 U.S.C. § 1983 violations pursuant to the Texas Wrongful Death Act (Chapter 71 of the Texas Civil Practice and Remedies Code). They seek those damages due to the wrongful death of their biological and legal son – Mario. The damages suffered by the Plaintiffs were caused and/or proximately caused by the natural person Defendants. If Mario had lived, he would have been entitled to bring a 42 U.S.C. § 1983 action and obtain remedies and damages provided by Texas law. Therefore, the natural person Defendants' actions caused, were the proximate cause

of, and/or were the producing cause of the following damages suffered by the Plaintiffs:

- loss of services that they would have received from her son, Mario;

- expenses for Mario's funeral;

- past mental anguish and emotional distress resulting from and caused by the death of their son, Mario;

- future mental anguish and emotional distress resulting from and caused by the death of their son, Mario;

- loss of companionship and society that they would have received from their son, Mario; and;

- exemplary/punitive damages.

Exemplary/punitive damages are appropriate in this case to deter and punish clear and unabashed violation of Mario's constitutional rights. The natural person Defendants' actions and inaction showed a reckless or callous disregard of, or indifference to, Mario's rights and safety. Moreover, the Plaintiffs seek reasonable and necessary attorneys' fees available pursuant to 42 U.S.C. §§ 1983 and 1988.

### Cause of Action Against Webb County Under 42 U.S.C. § 1983 for Violation of Mario Alberto Andrade, Jr.'s 14th Amendment Due Process Right as a Pretrial Detainee to Reasonable Medical Care (Conditions of Confinement)

110.    In the alternative, without waiving any of the other causes of action pled herein, without waiving any procedural, contractual, statutory, or common-law right, and incorporating all other allegations herein (including all allegations in the "Factual Allegations" section above) to the extent they are not inconsistent with the cause of action pled here, Defendant Webb County is liable to the Plaintiffs, pursuant to 42 U.S.C. § 1983, for violating Mario's right to reasonable medical care guaranteed by the Fourteenth Amendment to the United States Constitution. Claims in this section are typically referred to as "conditions of confinement" claims. According to the

Fifth Circuit Court of Appeals, the deliberate indifference standard in the context of Section 1983 claims based on official municipal policies is less stringent that the deliberate indifference standard used for Section 1983 claims based on the isolated actions of individual policymakers. Whereas the deliberate indifference standard for the actions of individual policymakers requires subjective awareness of the inmate's serious medical condition, the deliberate indifference standard for the official policy or practice Section 1983 claim is objective. Such an objective standard comports with *Kingsley v. Hendrickson* 135 S.Ct. 2466 (2015). Pretrial detainees are entitled to a greater degree of medical care than convicted inmates, according to the Fifth Circuit Court of Appeals. Webb County acted or failed to act under color of state law at all relevant times. Webb County's custom(s) or policy(ies) caused Mario's death and the Plaintiffs' resulting damages. Commander Ponce Coy Trevino and/or the person in charge of the Webb County jail was a policymaker for the county at all relevant times, and that person was the chief policymaker at all such times for the jail. In the alternative, the Webb County Commissioner's Court and/or Judge Tano Tijerina were the chief policymakers at all relevant times. The chief policymakers' failure to adopt, upon information and belief, policies referenced above in this pleading, as well as the failure to stop customs and policies which developed and which are mentioned above in this pleading, were intentional choices. Thus, the county was deliberately indifferent regarding its prisoners' serious medical and/or drug-related needs. These policies, practices, and customs were moving forces behind the violation of Mario's rights and showed deliberate indifference to the known or obvious consequences of constitutional violations (death).

111.    Also, upon information and belief, in the alternative, the county did not adequately train people working at its jail to provide reasonable medical care to prisoners. Importantly, regarding deliberate indifference, the failure to conduct such training before someone died (such

as with deaths occurring prior to Mario, as shown above) showed the callous and uncaring attitude of the county regarding rights of prisoners.

112.    Webb County's action, inaction, policies, and practices caused, proximately caused, and were producing causes of Mario's death and other damages suffered by Mario and the Plaintiffs.  Those actions and inaction violated Mario's constitutional rights.

113.    The United States Court of Appeals for the Fifth Circuit has held that using a state's wrongful death and survival statutes creates an effective remedy for civil rights claims pursuant to 42 U.S.C. § 1983.  Therefore, the Plaintiffs, individually, seek all remedies and damages available to them for the 42 U.S.C. § 1983 violations pursuant to the Texas Wrongful Death Act (Chapter 71 of the Texas Civil Practice and Remedies Code).  They seek those damages due to the wrongful death of her biological and legal son – Mario.  The damages suffered by the Plaintiffs were caused and/or proximately caused by Webb County.  If Mario had lived, he would have been entitled to bring a 42 U.S.C. § 1983 action and obtain remedies and damages provided by Texas law. Therefore, Webb County's actions, policies, procedures, practices, and customs caused, were the proximate cause of, and/or were the producing cause of, and were a moving force behind, the following damages suffered by the Plaintiffs:

- loss of services that she would have received from their son, Mario;

- expenses for Mario's funeral;

- past mental anguish and emotional distress resulting from and caused by the death of their son, Mario;

- future mental anguish and emotional distress resulting from and caused by the death of their son, Mario;  and

- loss of companionship and society that they would have received from their son, Mario.

Moreover, the Plaintiffs seek an award of reasonable and necessary attorneys' fees pursuant to 42

U.S.C. §§ 1983 and 1988.

<u>Cause of Action Against Webb County Under 42 U.S.C. § 1983 for Violation of
Mario Alberto Andrade, Jr.'s 14th Amendment Due Process Right as a Pretrial Detainee to be
Protected from Harm (Failure-to-Protect Claim) (Conditions of Confinement)</u>

114.    In the alternative, without waiving any of the other causes of action pled herein,
without waiving any procedural, contractual, statutory, or common-law right, and incorporating
all other allegations herein (including all allegations in the "Factual Allegations" section above) to
the extent they are not inconsistent with the cause of action pled here, Defendant Webb County is
liable to the Plaintiffs, pursuant to 42 U.S.C. § 1983, for violating Mario's right to protection
guaranteed by the Fourteenth Amendment to the United States Constitution.    Claims in this section
are typically referred to as "conditions of confinement" claims.    According to the Fifth Circuit
Court of Appeals, the deliberate indifference standard in the context of Section 1983 claims based
on official municipal policies is less stringent that the deliberate indifference standard used for
Section 1983 claims based on the isolated actions of individual policymakers.    Whereas the
deliberate indifference standard for the actions of individual policymakers requires subjective
awareness of the inmate's serious medical condition, the deliberate indifference standard for the
official policy or practice Section 1983 claim is objective.    Such an objective standard comports
with *Kingsley v. Hendrickson* 135 S.Ct. 2466 (2015).    Pretrial detainees are entitled to be protected.
Webb County acted or failed to act under color of state law at all relevant times.    Webb County's
custom(s) or policy(ies) caused Mario's death and the Plaintiffs' resulting damages.    Commander
Ponce Coy Trevino and/or the person in charge of the Webb County jail was a policymaker for the
county at all relevant times, and that person was the chief policymaker at all such times for the jail.
In the alternative, the Webb County Commissioner's Court and/or Judge Tano Tijerina were the
chief policymakers at all relevant times.    The chief policymakers' failure to adopt, upon

information and belief, policies referenced above in this pleading, as well as the failure to stop customs and policies which developed and which are mentioned above in this pleading, were intentional choices. Thus, the county was deliberately indifferent regarding its prisoners' serious medical and/or drug-related needs, and also their rights to be protected. These policies, practices, and customs were moving forces behind the violation of Mario's rights and showed deliberate indifference to the known or obvious consequences of constitutional violations (death).

115.    Also, upon information and belief, in the alternative, the county did not adequately train people working at its jail to provide reasonable medical care to prisoners and/or to protect them. Importantly, regarding deliberate indifference, the failure to conduct such training before someone died (such as with deaths occurring prior to Mario, as shown above) showed the callous and uncaring attitude of the county regarding rights of prisoners.

116.    Webb County's action, inaction, policies, and practices caused, proximately caused, and were producing causes of Mario's death and other damages suffered by Mario and the Plaintiffs. Those actions and inaction violated Mario's constitutional rights.

117.    The United States Court of Appeals for the Fifth Circuit has held that using a state's wrongful death and survival statutes creates an effective remedy for civil rights claims pursuant to 42 U.S.C. § 1983. Therefore, the Plaintiffs, individually, seek all remedies and damages available to them for the 42 U.S.C. § 1983 violations pursuant to the Texas Wrongful Death Act (Chapter 71 of the Texas Civil Practice and Remedies Code). They seek those damages due to the wrongful death of her biological and legal son – Mario. The damages suffered by the Plaintiffs were caused and/or proximately caused by Webb County. If Mario had lived, he would have been entitled to bring a 42 U.S.C. § 1983 action and obtain remedies and damages provided by Texas law. Therefore, Webb County's actions, policies, procedures, practices, and customs caused, were the

proximate cause of, and/or were the producing cause of, and were a moving force behind, the following damages suffered by the Plaintiffs:

- loss of services that she would have received from their son, Mario;

- expenses for Mario's funeral;

- past mental anguish and emotional distress resulting from and caused by the death of their son, Mario;

- future mental anguish and emotional distress resulting from and caused by the death of their son, Mario;  and

- loss of companionship and society that they would have received from their son, Mario.

Moreover, the Plaintiffs seek an award of reasonable and necessary attorneys' fees pursuant to 42 U.S.C. §§ 1983 and 1988.

Cause of Action Against Webb County Under 42 U.S.C. § 1983 for Violation of
Mario Alberto Andrade, Jr.'s 14th Amendment Due Process Right as a Pretrial Detainee not to be
Punished (No Punishment) (Conditions of Confinement)

118.    In the alternative, without waiving any of the other causes of action pled herein, without waiving any procedural, contractual, statutory, or common-law right, and incorporating all other allegations herein (including all allegations in the "Factual Allegations" section above) to the extent they are not inconsistent with the cause of action pled here, Defendant Webb County is liable to the Plaintiffs, pursuant to 42 U.S.C. § 1983, for violating Mario's right not to be punished, guaranteed by the Fourteenth Amendment to the United States Constitution.  Claims in this section are typically referred to as "conditions of confinement" claims.  According to the Fifth Circuit Court of Appeals, the deliberate indifference standard in the context of Section 1983 claims based on official municipal policies is less stringent that the deliberate indifference standard used for Section 1983 claims based on the isolated actions of individual policymakers.  Whereas the deliberate indifference standard for the actions of individual policymakers requires subjective

awareness of the inmate's serious medical condition, the deliberate indifference standard for the official policy or practice Section 1983 claim is objective. Such an objective standard comports with *Kingsley v. Hendrickson* 135 S.Ct. 2466 (2015). Pretrial detainees are entitled not to be punished at all. Webb County acted or failed to act under color of state law at all relevant times. Webb County's custom(s) or policy(ies) caused Mario's death and the Plaintiffs' resulting damages. Commander Ponce Coy Trevino and/or the person in charge of the Webb County jail was a policymaker for the county at all relevant times, and that person was the chief policymaker at all such times for the jail. In the alternative, the Webb County Commissioner's Court and/or Judge Tano Tijerina were the chief policymakers at all relevant times. The chief policymakers' failure to adopt, upon information and belief, policies referenced above in this pleading, as well as the failure to stop customs and policies which developed and which are mentioned above in this pleading, were intentional choices. Thus, the county was deliberately indifferent regarding its prisoners' serious medical and/or drug-related needs and their right not to be punished at all. These policies, practices, and customs were moving forces behind the violation of Mario's rights and showed deliberate indifference to the known or obvious consequences of constitutional violations (death).

119.    Also, upon information and belief, in the alternative, the county did not adequately train people working at its jail to provide reasonable medical care to prisoners and not to punish them through action, inaction, and/or deliberate indifference. Importantly, regarding deliberate indifference, the failure to conduct such training before someone died (such as with deaths occurring prior to Mario, as shown above) showed the callous and uncaring attitude of the county regarding rights of prisoners.

120.    Webb County's action, inaction, policies, and practices caused, proximately

caused, and were producing causes of Mario's death and other damages suffered by Mario and the Plaintiffs. Those actions and inaction violated Mario's constitutional rights.

121.    The United States Court of Appeals for the Fifth Circuit has held that using a state's wrongful death and survival statutes creates an effective remedy for civil rights claims pursuant to 42 U.S.C. § 1983. Therefore, the Plaintiffs, individually, seek all remedies and damages available to them for the 42 U.S.C. § 1983 violations pursuant to the Texas Wrongful Death Act (Chapter 71 of the Texas Civil Practice and Remedies Code). They seek those damages due to the wrongful death of her biological and legal son – Mario. The damages suffered by the Plaintiffs were caused and/or proximately caused by Webb County. If Mario had lived, he would have been entitled to bring a 42 U.S.C. § 1983 action and obtain remedies and damages provided by Texas law. Therefore, Webb County's actions, policies, procedures, practices, and customs caused, were the proximate cause of, and/or were the producing cause of, and were a moving force behind, the following damages suffered by the Plaintiffs:

- loss of services that she would have received from their son, Mario;

- expenses for Mario's funeral;

- past mental anguish and emotional distress resulting from and caused by the death of their son, Mario;

- future mental anguish and emotional distress resulting from and caused by the death of their son, Mario; and

- loss of companionship and society that they would have received from their son, Mario.

Moreover, the Plaintiffs seek an award of reasonable and necessary attorneys' fees pursuant to 42 U.S.C. §§ 1983 and 1988.

## Conditions Precedent

122.    All conditions precedent to assertion of the Plaintiffs' claims have occurred.

<u>Use of Documents at Trial or Pretrial Proceeding</u>

123.    The Plaintiffs intend to use at one or more pretrial proceedings and/or at trial all documents produced by the Defendants in this case in response to written discovery requests.

<u>Jury Demand</u>

124.    The Plaintiffs demand a jury trial on all issues which may be tried to a jury.

<u>Prayer</u>

125.    For these reasons, the Plaintiffs ask that the Defendants be cited to appear and answer, and that the Plaintiffs have judgment for damages within the jurisdictional limits of the court and against the Defendants, jointly and severally, as legally applicable, for:

a)    actual damages of and for the Plaintiffs individually including but not necessarily limited to the following:

- loss of services that they would have received from their son, Mario;

- expenses for Mario's funeral;

- past mental anguish and emotional distress resulting from and caused by the death of their son, Mario;

- future mental anguish and emotional distress resulting from and caused by the death of their son, Mario; and

- loss of companionship and society that they would have received from their son, Mario;

b)    exemplary/punitive damages for the Plaintiffs from the natural person Defendants;

c)    reasonable and necessary attorneys' fees for the Plaintiffs through trial and any appeals and other appellate proceedings, pursuant to 42 U.S.C. §§ 1983 and 1988;

d)      court costs and all other recoverable costs;

e)      prejudgment and postjudgment interest at the highest allowable rates;  and

f)      all other relief, legal and equitable, general and special, to which the Plaintiffs are entitled.

Respectfully submitted,

Law Offices of Dean Malone, P.C.

By: /s/ T. Dean Malone

T. Dean Malone
Texas State Bar No. 24003265
dean@deanmalone.com
Michael T. O'Connor
Texas State Bar No. 24032922
michael.oconnor@deanmalone.com
900 Jackson Street
Suite 730
Dallas, Texas 75202
Telephone:      (214) 670-9989
Telefax:        (214) 670-9904

Attorneys for the Plaintiffs